# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LAWANDA KING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 13 C 7967 |
| v. | ) |
| | ) Judge John Z. Lee |
| FORD MOTOR COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff LaWanda King has sued Defendant Ford Motor Co. ("Ford"), alleging that it violated her rights under Title VII of the Civil Rights Act of 1964, as amended under 42 U.S.C. §§ 2000 *et seq.*, the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, and the Illinois Whistleblower Act, 740 Ill. Comp. Stat. 174/1 *et seq.* Ford now moves for summary judgment. For the following reasons, the Court grants the motion.

## Factual Background[1]

King began working for Ford as an hourly employee in Ohio on October 5, 1992, before eventually transferring to the assembly plant in Chicago, Illinois in 2010. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 2, 4. As an hourly employee and union member, the terms and conditions of King's employment were governed by a collective bargaining agreement ("CBA"). *Id.* ¶ 6.

Her present claims against Ford stem from events in 2011, when King allegedly began to experience various issues at the Chicago assembly plant. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 102–03; Compl. ¶¶ 9–23. These issues prompted King to call Ford's Anti-Harassment Hotline on several occasions, as well as file a charge with the Equal Employment Opportunity

---

[1] The following facts are undisputed unless otherwise noted.

Commission ("EEOC") on March 20, 2012, alleging sex harassment, race discrimination, disability discrimination, and retaliation. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 9, 31, 33. The EEOC issued a right-to-sue notice on August 31, 2012, and sent it to the P.O Box listed on the charge. *Id.* ¶ 12. As of that date, however, King was no longer receiving mail at that address, and it was not until around Labor Day 2012 that King contacted the EEOC to provide her updated contact information. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 13.

In her complaint, King alleges that, as a consequence of her calling the Anti-Harassment Hotline and filing an EEOC charge, the company began treating her less favorably. Compl. ¶¶ 59–60. For example, King claims she did not get paid for hours worked on multiple occasions. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 50–51. In one instance, King complained through a union grievance process about a pay shortage of 6.5 hours on December 17, 2012, and on March 4, 2013, after which Ford agreed to pay King for the alleged shortage. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 49–50. According to King, she filed several more grievances complaining of similar incidents, but she does not specify the dates such incidents occurred. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 51. Nor does King identify who at Ford was responsible for these incidents. *Id.* ¶ 53.

In addition, King alleges she was continually denied overtime opportunities throughout her tenure with Ford. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 45. Overtime opportunities for hourly employees are governed by the CBA, which states that employees are selected for overtime based on seniority and other factors. *Id.* ¶ 43. Employees who believe they have been wrongly denied the opportunity to work overtime can file a union grievance. *Id.* ¶ 44. King filed such a grievance on December 17, 2012. *Id.* ¶ 45. Although King avers generally that she was denied overtime throughout her tenure, she does not point to any other particular incident or grievance in support. *Id.*

King also contends Ford "malicious[ly]" disciplined her in several instances. Compl. ¶ 60. King concedes that she was disciplined for: (1) absenteeism on August 9, 2011; (2) showing disrespect to proper authority on December 15, 2011; (3) leaving her job without permission on December 16, 2011; (4) leaving her job without permission on February 27, 2012; (5) failure to follow plant rules on April 12, 2012; and (6) refusing to do a job on April 12, 2012. Def.'s LR 56.1(a)(3) Stmt. ¶ 54. In addition, pursuant to its National Attendance Policy, Ford suspended King for two weeks on January 23, 2013 because its records showed that she was absent on eight occasions. *Id.* ¶ 55. According to King, the suspension was unwarranted because she should not have been charged as being absent on those days. *Id.* ¶¶ 56–57.

On March 7, 2013, King called Ford's disability benefits administrator, Unicare, and requested to be placed on a medical leave of absence, effective March 4, 2013. *Id.* ¶ 59. Unicare advised King that her phone call automatically initiated a fourteen-day conditional medical leave, but King would still need to submit a Medical Certification Form completed by her physician explaining the basis for her requested leave and indicating whether she would need an extension beyond the conditional fourteen day period. *Id.* ¶¶ 60–61. King submitted her Medical Certification Form sometime before March 21, 2013, requesting an extension beyond the conditional period. *Id.* ¶ 63. Ford's Medical Department, however, determined that the form lacked sufficient details to support King's request for a medical leave. *Id.* ¶ 64. First, the form listed both the beginning and ending dates of King's incapacity as 3/4/13. *See* Def.'s Reply Pl.' s LR 56.1(b)(3)(C) Stmt. ¶ 96; Def.'s Ex. JJ, Hubbard Decl. ¶ 5. In addition, the form stated that the anticipated return-to-work date was uncertain. *See id.*

These events triggered the 5-Day Quit Process, a "contractual procedure governed by the CBA." Def.'s LR 56.1(a)(3) Stmt. ¶ 66. An employee seeking continued time off after the

expiration of medical leave, "must provide sufficient documentation to support and justify" the continuation of leave. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 25. If the employee fails to do so, the employee will be given five business days to rectify the situation or face termination. Def.'s LR 56.1(a)(3) Stmt. ¶ 66, Ex. C.

Ford provided King notice of the 5-Day Quit Process in a letter dated March 21, 2013. The letter informed King her request for continued absence was denied because the form she provided did not contain sufficient information. Def.'s LR 56.1(a)(3) Stmt. ¶ 65. The letter also notified King, that if she did not report to the Human Resources Office or give a satisfactory reason for her continued absence to the Human Resources Office in writing or by telephone within five working days from the date of the letter, she would be terminated and lose her seniority. Def.'s Ex. KK, 3/21/13 Letter from Dahringer to King.

On April 1, 2013, King contacted three labor representatives and was informed that her medical leave dates were incorrectly documented and that she needed her doctor to provide reasons for an extension or she would be terminated. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 78; Def.'s Ex. R, Plaintiff's Fifth Supplemental Responses ¶ 3. On April 2, King's medical care provider faxed to Unicare a document that stated the following:

> Patient Lawanda King is under my care at Rush University Medical Center. Her medical leave began on 3/4/13 and will need to be extended until 4/30/13. If her leave needs to be extended beyond 4/30/13, we will contact your department.
>
> With patient's verbal consent, will fax this letter to the Ford Motor Company (fax # 773 646 6604) and Unicare (fax # 855 318 9193).

*See* Def.'s Reply Pl.' s LR 56.1(b)(3)(C) Stmt. ¶ 121; Def.'s Ex. VV, 4/2/13 Facsimile. That same day, she was discharged for failing to properly respond to the 5-Day Quit Notice. Def.'s LR 56.1(a)(3) Stmt. ¶ 79.

After Ford denied her request, King filed a charge with the EEOC and the Illinois Department of Human Rights ("IDHR") on March 27, 2013, alleging that Ford had discriminated against her based on her disability and retaliated against her by denying her request for continuation of medical leave. Def.'s LR 56.1(a)(3) Stmt. ¶ 14. The EEOC sent Ford a notice that King had filed the March 27, 2013, charge on April 5, 2013. *Id.* ¶ 16. After she was terminated, King filed another charge with the EEOC and the IDHR on April 22, 2013, alleging disability discrimination and retaliation based upon her firing. *Id.* ¶ 18. On August 22, EEOC sent King a notice of right to sue regarding her March 27 and April 22 charges. *Id.* ¶¶ 17, 19. King then filed suit with this Court on November 6, 2013.

**Legal Standard**

Summary judgment is proper in cases where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Once the movant has sufficiently demonstrated the absence of a genuine issue of material fact, the non-movant must then set forth specific facts demonstrating that there are disputed material facts that must be decided at trial. *Id.* at 321–22.

**Analysis**

I.  **Title VII Sex Harassment**

As an initial matter, Ford contends King's sex harassment claims are time barred. Def.'s Mem. 3. King's allegations pertaining to sex harassment were the subject of her First EEOC Charge. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 9, Ex. F. Under Title VII, King was required to file suit within ninety days of receiving her right-to-sue notice. 42 U.S.C. § 2000e-5(f)(1). King

5

filed this suit over fourteen months after the EEOC had issued this notice, but she offers two reasons why these claims should not be barred.

First, King argues equitable tolling should apply because she "never received her Dismissal and Notice of Rights." Pl.'s Resp. 3. It is true that, generally speaking, "actual receipt of the notice is required to start running the 90-day clock." *Reschny v. Elk Grove Plating Co.*, 414 F.3d 821, 823 (7th Cir. 2005). However, "when the notice is delayed by fault of the plaintiff, the constructive receipt doctrine applies and the 90-day clock starts running once delivery is attempted at the last address provided." *Id.*

Here, King admits she changed addresses before the EEOC had issued her right-to-sue notice but failed to notify the EEOC of the change until after issuance. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 13 ("Plaintiff admits that on August 31, 2012, she was no longer using P.O. Box 08074 as her address."); King Decl. ¶ 5 ("I contacted the EEOC to inform them that my address had changed on or around Labor Day of 2012."). The constructive receipt doctrine thus applies, and her claims are untimely. *See Reschny*, 414 F.3d at 823 ("[Plaintiff's] negligence in failing to apprise the EEOC of his change of address does not toll the period of limitations. That he might not have acquired a new address . . . is irrelevant because he was still responsible for notifying the EEOC of changes to his contact information.").[2]

King nevertheless argues her sex harassment claims should survive because her Second and Third EEOC Charges "referenced and incorporated her first charge." Pl.'s Resp. 3. But this is incorrect. While the Second and Third Charges may refer to the prior sex harassment charge, they do not otherwise save it from being time-barred. Of course, she may still use "the prior acts [of sexual harassment] that fall outside the statute of limitations as *background evidence* in

---

[2] In the same vein, to the extent that King bases her Title VII retaliation claim on events that took place prior to her filing of the March 20, 2012 EEOC Charge, such claims are also time-barred.

support of a timely claim." *Malin v. Hospira, Inc.*, 762 F.3d 552, 561 (7th Cir. Ill. 2014) (emphasis added). But this does not mean, as King suggests, that she may pursue her untimely sexual harassment claims here. Accordingly, the Court grants summary judgment in favor of Ford with regard to Count II.

## II. Retaliation Claim

The parties dispute whether King can prove that her termination or any prior adverse treatment was in retaliation for her Anti-Harassment Hotline calls and March 2012 complaint to the EEOC. Under Title VII, King can prove retaliation in one of two ways: the direct method or the indirect method. *Ripberger v. Corizon*, Inc., 773 F.3d 871, 881, 883 (7th Cir. 2014). King contends she can proceed under either method here.

### A. Direct Method

The direct method requires King to show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *Id.* at 881. Ford does not contest the fact that King engaged in statutorily protected activity or suffered adverse employment actions. Consequently, the parties' dispute focuses on whether King can establish a causal connection between the statutorily protected activity and her termination or any unfavorable treatment that she received before her departure.

Absent evidence that amounts to a "smoking gun," King must assemble pieces of circumstantial evidence that collectively "provide strong support" of a causal connection. *Harden v. Marion Cnty. Sheriff's Dep't*, No. 14-1713, 2015 WL 5015633, at *4 (7th Cir. Aug. 25, 2015) (internal quotations omitted). The Seventh Circuit "recognize[s] three categories of circumstantial evidence: suspicious timing, ambiguous statements, and 'other bits and pieces from which an inference of [retaliatory] intent might be drawn'; evidence that similarly-situated

7

employees were treated differently; and evidence that the employer's stated reason for the decision was pretext." *Id.* (quoting *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 647 (7th Cir. 2013)).

i. **Causal Connection to King's Termination**

To establish a causal connection between her termination and protected activity, King relies on the timing of her discharge, a statement made by a person in Ford's Human Resources Department, and her suggestion that her failure to comply with the 5-Day Quit Process was merely a pretextual reason for her termination. *See* Pl.'s Resp. 10, 14–15. None of these factors, however, work in King's favor.

First, regarding the timing of her termination, Ford was not aware that King had filed her second and third EEOC charges when it terminated her; King admits that notice of the second charge was only sent to Ford following her dismissal, and that the third charge was not filed until after her termination. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 16. Thus, the only protected activities at issue are King's March 20, 2012 EEOC charge, and the lone hotline call made on April 20, 2012.[3] *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 123, Ex. 15. The duration of roughly a year between King's protected activity and her April 2013 termination is too long to raise a reasonable inference of causation. *See*, *e.g.*, *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (five-month passage of time too long to "by itself suggest a causal link").

Second, to suggest a retaliatory motive for her termination, King attempts to rely on a statement made by a Ford Human Resources representative and cites to the declaration of Grant Morton, a former Ford employee who allegedly overheard the statement in question. *See* Pl.'s

---

[3] King suggests in her brief that there were more hotline calls but does not indicate when those were or provide any basis for finding that they were after April 20, 2012. *See* Pl.'s Resp. 15; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 123. As noted above, King cannot rely on any hotline calls made prior to March 20, 2012, as a basis for her retaliation claim. *See supra* n.2.

8

LR 56.1(b)(3)(C) Stmt., Ex. 25, Morton Decl. Ford, however, complains that Morton was never disclosed by King in her Rule 26(a) disclosures and moves to strike the declaration. Def.'s Reply 8. Under Rule 26(a)(1)(i), a party must disclose the identity of any person "likely to have discoverable information — along with the subjects of that information — that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(i). When a party fails to identify a witness as required by Rule 26(a), that "party is not allowed to use that . . . witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

King admits she did not disclose Morton but simply responds that he was mentioned both in King's deposition and her responses to interrogatories, and thus Ford had the opportunity to depose him. Pl.'s Surreply 2. King does not bother to pinpoint those portions of the record referring to Morton. Nevertheless, upon the Court's own review, it is clear that the references to Morton in King's deposition and interrogatories would not have alerted Ford that Morton possessed knowledge relating to the retaliatory nature of King's termination. The prejudice to Ford is obvious: Ford could have deposed Morton to obtain additional information regarding the statement and the date that the alleged conversation took place. Nor does King offer any substantial justification for her failure to disclose this information to Ford as part of discovery. Accordingly, the Court strikes Morton's declaration from the record on summary judgment.

Finally, despite her claims to the contrary, King cannot genuinely dispute the fact that she was discharged for any other reason than her failure to properly respond to the 5-Day Quit Notice. The notice, dated March 21, 2013, informed her that within five days she could either return to work or provide some "satisfactory reason for [her] continued absence to the Human Resources Department in writing or by telephone." Def.'s LR 56.1(a)(3) Stmt. ¶ 69, Ex. KK.

9

There is some disagreement as to whether King needed to respond by April 1, 2013, or April 2, 2013, but that is immaterial. The 5-Day Quit Notice informed King that she needed to provide a reason to justify her absence, and King failed to do so.

King stresses the fact that she "left messages with [Ford's] Labor Relations Department and spoke to [Ford's] Medical Department" on April 1, 2013, and that her doctor faxed "an extension of [her] . . . leave" to the Medical Department on April 2, 2013. *See* Pl.'s Resp. 10. But contacting Ford was only half the battle. King still fails to explain how the content of any of the communications provided sufficient justification for her continued absence. *See id.* at 10–11. For example, the April 2, 2013 fax stated King needed to extend her medical leave, but did not offer the reason why she needed it extended, as the notice plainly required.[4] Lacking any evidence she complied with the 5-Day Quit Process, a jury cannot reasonably infer Ford's justification for her termination was pretext, and King cannot establish a causal connection between her termination and protected activity.

### ii. Causal Connection to Other Adverse Treatment

King's attempts to establish a causal connection between her protected activities and other incidents of adverse treatment by Ford similarly fail. King argues Ford's adverse treatment "took place on the heels of [her] protected activity." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994). But even according to King's declaration, the alleged adverse actions against her began in 2011, *before* she ever filed her first EEOC claim against Ford or called the Anti-Harassment Hotline. *See* Pl.'s LR 56.1(b)(3)(C) Stmt., Ex. 24, King Decl. ¶¶ 9, 19. Further, she cites to six dates on which she was subject to allegedly retaliatory discipline,

---

[4] It is not even clear if the fax went to Ford at all. While the 5-Day Quit Notice explicitly directed King to contact Ford's Human Resources Department, the cover page of the fax reveals that it instead went to Unicare, Ford's third-party benefits administrator. *See* Def.'s Reply Rpl.'s 56.1(b)(3)(C) Stmt. ¶ 121, Ex. VV. And although King's doctor states in the letter that she intended to fax the same to Ford, there is nothing in the record to indicate she did.

four of which predate her EEOC charge.  *See id.*, Ex. 18.  It goes without saying that a jury may not reasonably infer Ford retaliated against King based on an EEOC charge that had not yet been filed.  And as for the remaining two disciplinary actions, King offers no evidence that the person responsible for them had any knowledge of her EEOC charge or hotline calls.

Lastly, while King claims Ford improperly marked her AWOL on several occasions, she does not indicate when.  In order to reasonably infer a causal connection based on the temporal proximity of events, one must necessarily know when those events occurred.  King has not provided the relevant dates or facts upon which to base a causal connection.

**B.  Indirect Method**

King also argues she can prove both her termination and any prior discipline were retaliatory under the indirect method of proof.  Under the indirect method, King must show she: (1) engaged in statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in protected activity.  *Ripberger*, Inc., 773 F.3d at 883.

King's ability to proceed under this method, however, is quickly thwarted by the fact that she cannot point to one similarly situated individual who was treated more favorably.  To this end, King provides two vague assertions: (1) "In some instances, [Ford] calls employees before mailing a 5-Day Quit Notice," and (2) "[her] terms and conditions were less favorable than other employees who did not engage in protected activity."  These are plainly inadequate.  *See Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 703 (7th Cir. 2012) ("The 'similarly-situated' inquiry is a 'flexible, common-sense one,' . . . but it at least requires that the plaintiff *name* a comparator outside her protected class.") (internal citation omitted) (emphasis added).

Lacking the ability to prove this part of her claim, King cannot proceed under the indirect method. Consequently, the Court grants summary judgment in favor of Ford on Count III.

### III. FMLA Interference and Retaliation

King also sues Ford for FMLA interference and retaliation. The FMLA provides that an "eligible employee" may take up to twelve work weeks of leave in a one-year period following certain events: a disabling health problem; a family member's serious illness; or the arrival of a new son or daughter. 29 U.S.C. § 2612(a)(1). The FMLA also makes it unlawful for an employer to "interfere with, restrain, or deny the exercise or the attempt to exercise" any FMLA rights or to retaliate against an employee for doing the same. *See id.* §§ 2615(a)(1)–(2), (b); *see also Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005) ("We have construed [§ 2615(a)(2) and (b)] to create a cause of action for retaliation.").

To prove either type of claim, King must first establish that she was actually eligible for FMLA protection. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013) (requiring eligibility to prove FMLA interference, stating that "[t]here can be no doubt that the request — made by an ineligible employee for leave that would begin when she would still have been ineligible — is not protected by the FMLA."); *Brown v. Pitt Ohio Express, LLC*, No. 12 C 2420, 2013 WL 5221483, at *3 (N.D. Ill. Sept. 16, 2013) (requiring eligibility to prove FMLA retaliation); *see also Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1018 (7th Cir. 2000) (plaintiff bears the burden of proving FMLA eligibility). Under the FMLA, an "eligible employee" is an employee who has worked for the employer for at least one year and for at least 1,250 hours during the year preceding the requested leave. 29 U.S.C. § 2611(2)(A).

According to Ford, as of April 2, 2013, the date of King's termination, she had only worked 970.6 hours in the preceding twelve months. Def.'s LR 56.1(a)(3) Stmt. ¶ 88 (citing

12

Def.'s Ex. OO, Timekeeping Report, and Def.'s Ex. O, Wynn Decl. ¶ 36). King denies this, opining that the time-keeping report was inaccurate because Ford improperly marked her as AWOL for days she actually had worked, and asks the Court to count these days for FMLA purposes. But King does not point to any evidence to establish that the hours in question total at least 279.4 hours, *i.e.*, the difference between the number of hours reported (970.6 hours) and the number of hours required to be FMLA-eligible (1,250 hours). King's general assertion that she should be credited for working an unspecified number of days does not create a reasonable inference that she worked 279.4 more hours than the timekeeping report shows. Accordingly, King has failed to create a genuine issue of fact requiring a trial as to her FMLA eligibility, and the Court grants Ford's motion for summary judgment as to Count I.

IV.    **Illinois Whistleblower's Act**

With regard to her Illinois Whistleblower's Act claim, King invokes the Court's supplemental jurisdiction under 28 U.S.C. § 1367. *See* Compl. ¶ 2. Where no federal claims remain, however, a district court generally will relinquish supplemental jurisdiction as to the remaining state law claims. *See Miller Aviation v. Milwaukee Cnty. Bd. of Supervisors*, 273 F.3d 722, 732 (7th Cir. 2001). "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). Having granted summary judgment in favor of Ford on all of King's federal claims, the Court declines to exercise supplemental jurisdiction over her Illinois Whistleblower's Act claim. *See* 28 U.S.C. § 1367(c)(3); *see also Isquith by Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 532 (7th Cir. 1998) (dismissing class action claims under federal securities law and relinquishing jurisdiction over

remaining state law claims under 28 U.S.C. § 1367(c)(3)). Accordingly, Count IV is dismissed without prejudice.

## Conclusion

For the reasons provided herein, the Court grants Defendant's motion for summary judgment [44]. Civil case terminated.

**SO ORDERED**                    **ENTER:  9/29/15**

_____
**JOHN Z. LEE**
**U.S. District Judge**